**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RIDLEY SCHOOL DISTRICT** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **No. 09-2503** |
| | : | |
| **M.R. and J.R., Parents of** | : | |
| **the minor child, E.R.** | : | |

**Goldberg, J.**                                        **February 14, 2011**

## MEMORANDUM OPINION

This case arises under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794. Plaintiffs, M.R. and J.R. (hereinafter "Parents"), have alleged that the Ridley School District (hereinafter "Ridley") failed to timely evaluate and identify their child, E.R., as a student in need of special education and failed to implement an appropriate plan during E.R.'s kindergarten, first and second grade years. Parents also claim that Ridley discriminated against E.R. based upon her disabilities.

The Administrative Hearing Officer concluded that Ridley complied with the IDEA for E.R.'s kindergarten year but found several violations of that Act for E.R.'s first and second grade years. The Officer also concluded that Ridley's discriminatory conduct during E.R.'s first grade year violated the Rehabilitation Act.

Currently before me are the parties' cross motions for judgment on the administrative record. After careful consideration of the parties' extensive briefing and review of the administrative record, I agree with the Hearing Officer only to the extent that she concluded that Ridley complied with the IDEA for E.R.'s kindergarten year. I disagree with the remaining findings reached by the Officer, and accordingly, I will grant Ridley's motion and deny E.R.'s motion.

1

# I.    FACTS AND PROCEDURAL HISTORY

## A.    Facts - Free Appropriate Public Education

E.R., who was eight years old when the Hearing Officer's April 21, 2009 report was issued, attended school in the Ridley School District, for kindergarten (2006-2007), and first grade (2007-2008).  After first grade, Parents removed E.R. from Ridley and enrolled her in the Benchmark School, a private school that specializes in teaching students with learning disabilities.

Prior to attending kindergarten, Parents had concerns about E.R.'s pre-academic skills and had her evaluated at the Chester County Intermediate Unit.[1]  Although that testing noted some academic difficulties, the results reflected that E.R. did not qualify as a child with special needs. (H.O. Rpt. ¶¶ 7-8.)

In September of 2006, E.R.'s kindergarten year, Ridley placed her in extended day kindergarten for extra academic help.  Parents were notified of this placement and were advised it was for math and reinforcement of kindergarten academic skills.  (H.O. Rpt. ¶ 10.)

In November of her kindergarten year, Parents requested that Ridley undertake an educational evaluation due to what they perceived to be E.R.'s  academic struggles and attention issues.  Ridley agreed, and an Initial Evaluation Report was completed on January 31, 2007.  While this report noted certain academic difficulties, it concluded, consistent with the Chester County Intermediate Unit's findings, that E.R. did not qualify for special services because her cognitive ability and achievement levels were both in the average range.  (H.O. Rpt. ¶ 13.)

---

[1] Chester County Intermediate Unit is a regional educational agency established by Pennsylvania law, which works between the Pennsylvania Department of Education and local school districts.  It provides services such as special education programs and staff development. See http://www.cciu.org/222510312162226607/site/default.asp.

On February 7, 2007, Ridley convened an Independent Educational Plan (hereinafter IEP) team meeting to review the initial evaluation. There, Parents expressed their disagreement with Ridley's assessment that E.R. was not learning disabled. In response, Ridley agreed to additional testing, which included: The Children's Memory Scale, Test of Auditory Processing Skills, and The Behavior Rating Inventory of Executive Functioning. Ridley also agreed to undertake provide a physical therapy evaluation. (H.O. Rpt. ¶ 18.)

This additional testing resulted in addendums to the original Evaluation Report. The first addendum, dated April 18, 2007, concluded that E.R.'s memory and auditory processing and executive functioning were all within the average range, but noted a relative weakness in retaining and manipulating numbers. A second addendum, dated June 5, 2007, found average cognitive functioning and academic skills also within the average range. In summary, these addendums reflected average ranges for E.R. in most areas tested. Indeed, the WIAT-II (Wechsler Individual Achievement Test - Second Edition) indicated average skills for E.R. across all academic areas. (H.O. Rpt. ¶¶ 20, 23.)

Based on these results, Ridley's school psychologist noted that there was a lack of a statistically significant discrepancy between E.R.'s cognitive functioning and standardized achievement tests and E.R.'s classroom based assessments, which indicated "consistent and significant progress in all areas." Consequently, Ridley's psychologist again concluded that there was an absence of a specific learning disability. (H.O. Rpt. ¶ 23.)

Pursuant to E.R.'s kindergarten teacher's recommendation, E.R. attended a summer program called "Summer Steps Program" to reinforce her academic skills. There, it was reported that E.R. made academic progress but that she needed improvement in several academic areas, and that she had difficulties recognizing numbers and counting. (H.O. Rpt. ¶¶ 24-25.)

The initial portion of E.R.'s first grade year were spent reviewing kindergarten materials. During that time, E.R. struggled academically. In late September 2007, Parents requested a meeting with E.R.'s first grade teacher, Janet Cenname. Because the school year had just started, Mrs. Cenname believed it was premature to meet and would be more prudent to allow E.R. to develop her skills at school and at home. However, Mrs. Cenname readily offered to meet with Parents shortly thereafter in early October. (H.O. Rpt. ¶¶ 32-33; Parents' Ex.13.)

Rather than re-contacting Mrs. Cenname, Parents met with the school's principal on November 1, 2007, where Parents were advised that E.R. had been placed on a "reading watch list." After this meeting, E.R. was placed in a reading support group, but according to Parents, she had difficulty catching up because the group had started two months earlier. (N.T. 130-133; H.O. Rpt. ¶ 35.)

On November 16, 2007, Parents requested a comprehensive re-evaluation. Ridley issued its permission to re-evaluate on November 27, 2007 and the re-evaluation was completed on February 26, 2008. (H.O. Rpt. ¶¶ 34-36, 39.) The Re-evaluation Report found E.R. to have disabilities in the areas of reading, written language, and math and reasoning skills. She was also found to have "fine motor delays and a language disability." (H.O. Rpt. ¶ 40.) Accordingly, Ridley's psychologist prepared recommendations for the IEP team regarding special educational services for E.R.[2] Parents

---

[2] These recommendations included: (1) resource room level learning support services for her reading decoding and comprehension, math computation and reasoning skills, and written language disabilities; (2) language therapy; (3) continuation with occupational therapy services; (4) E.R.'s § 504 Service Plan for her food allergies would become part of her IEP as an Individual Health Plan (IHP); (5) instructing that E.R. responds well to clear and concise directions and instructions as well as chunking of information; (6) directions to rephrase or restate information as needed; (7) directions to present materials in a concrete and meaningful format so as to help insure E.R.'s understanding of new information; (8) providing visuals when presenting auditory information; (9) preferential seating which would benefit E.R.; and (10) positive reinforcement.

signed the Re-evaluation Report in agreement.  (H.O. Rpt. ¶ 41.)

Based on the Re-evaluation Report, the district offered two possible placements for E.R.: the learning support room at her current school or a self contained classroom at a different elementary school within the district.  Parents observed both classrooms but concluded neither program was appropriate for E.R.  (H.O. Rpt. ¶ 42.)

After Parents completed their visit and review of the two suggested placements, the IEP team met on March 28, 2008, to review the draft IEP.  At that meeting, the team agreed to certain revisions.  In addition to other services and accommodations, Ridley's Director of Special Education suggested a program called Project Read as a possible reading aid for E.R. and agreed to look into the program and provide follow-up recommendations.  Thereafter, the IEP team met several more times, with Parents requesting further revisions to the proposed IEP.   On May 9, 2008, after most of these requested revisions were incorporated, a corrected Notice of Recommended Educational Placement (NOREP) was issued and Parents signed it in agreement.  (H.O. Rpt. ¶¶ 43-50.)

On May 13, 2008, in accordance with the IEP, E.R. began going to her school's resource room every day for an hour of reading assistance and a separate hour of math assistance.  The resource room reading program consisted of the following:  Read Naturally, Reading Workshop, Writing Workshop, and Patricia Cunningham's Systematic Phonics.  Aimee Hodges, the resource room teacher, testified that everything done in the resource room was multi-sensory, meaning there were visual, oral, and hands on components.  Hodges explained that she concentrated on areas of weakness that were noted in E.R's evaluation.  The resource room math program consisted of Everyday Math.  Hodges again noted that she focused on areas where E.R. needed work. (N.T. 615-25.)

There were five other students in the resource room.  None were first graders and each had

different learning issues, yet all were provided with the same reading programs. (H.O. Rpt. ¶ 53.) Hodges testified that while all the students used the same program, different parts of the program were used for different students, so that assistance was geared towards each student's specific needs. (N.T. 638-39.)

E.R.'s grades in the resource room improved, however, Parents attributed this improvement to resource room assistance. E.R. received eighteen days of resource room assistance before her first grade year concluded. (H.O. Rpt. ¶¶ 51, 56-57.)

On June 9, 2008, the IEP team met to update E.R.'s IEP. There, it was recommended that E.R. continue to receive services from the resource room: one hour per day concentration in reading and at least one hour for math. (H.O. Rpt. ¶ 59.) Additionally, Ridley agreed to pay for a summer learning program at the Benchmark Camp along with summer math tutoring three times a week. (H.O. Rpt. ¶ 47.) Ridley also again suggested Project Read, to begin in late September of E.R.'s second grade year. Specifically, the NOREP issued after that meeting set out that Ridley would train their learning support staff on Project Read during the summer and the program would be up and running by the end of September. Parents researched Project Read and concluded that it was not appropriate for E.R. (H.O. Rpt. ¶¶ 60-61.)

On August 14, 2008, Parents advised Ridley that for second grade (2008-2009), E.R. would be enrolling at the Benchmark School. Parents testified that E.R. required an "intensive multi-sensory approach to reading" and that 60 minutes a day was not sufficient. (H.O. Rpt. ¶¶ 60, 63.)

B. Facts - Rehabilitation Act Claims, 29 U.S.C. § 701, et. seq.

E.R.'s health related disabilities included severe food allergies, asthma and eczema, which necessitated her wearing loose cotton clothing to avoid skin irritation. (H.O. Rpt. ¶ 4.) In June of 2006, prior to E.R.'s kindergarten year, Ridley prepared an Allergy Treatment Plan to address these

health issues.  (H.O. Rpt. ¶¶ 4-5.)[3]

In February, 2007, a § 504 Service Agreement was implemented to further address E.R.'s allergies.  The original agreement was issued to provide Occupational Therapy (OT) services and under this plan, E.R. was to receive OT once weekly for 30 minutes and "consultative services to the home and classroom on a regular basis."  On February 9, 2007, an Addendum was developed to include the Health Action Plan and address E.R.'s allergies.  Parents signed the agreement on March 8, 2007.  (Ridley's Exs. 14, 16.)  In August of 2007, Parents reiterated that despite her allergies, E.R. should be included in as many activities as possible.  To that end, E.R.'s Service Agreement reflected that Parents were to be contacted before activities involving shared food so that appropriate alternatives could be offered.  (H.O. Rpt. ¶¶ 19, 26, 28.)

Parents alleged that E.R.'s first grade teacher, Mrs. Cenname, "stubbornly and persistently refused" to implement E.R.'s Service Agreement, which resulted in E.R. being "consistently singled out, isolated and denied full participation with her classroom peers."  (Parents' Mem. 40.)[4]  Parents' evidence of discrimination specifically included the following:

-   Regarding what has been referred to as the "Clifford Dog" celebration, which included a theme of red food, E.R.'s classmates were given red icing and red juice while E.R. was given a cupcake suitable to her health/dietary needs.  (Parents' Mem. 41.)

-   Parents cite a second example wherein a program on nutrition was offered along with

---

[3] The Allergy Treatment Plan alerted school staff of E.R.'s allergies (eggs, milk, and epoxy), the signs of allergic reactions (minor or major), and how the school should react if E.R. were to have an allergic reaction, including first aid treatment, medication, and who to call.  An Asthma Patient Action Plan for E.R. was also included.  (Ridley's Exs. 4 & 5.)

[4] The "Memorandum in Support of Answer of M.R. and J.R., Parents of Minor Child E.R., to Motion for Judgement on Administrative Record and Counter-Motion for Judgement on the Administrative Record" will be cited to as "Parents' Mem."  The "Memorandum of Law in Support of Motion of the Ridley School District for Judgement on Administrative Record" will be cited to as "Ridley's Mem."

a specific snack.  Parents claim E.R. was subject to discrimination in that they were not notified as to what the snack would be and consequently, E.R. had a snack from home while the other children had the integrated snack.  (Parents' Mem. 41-42.)

- Parents also point to two occasions where Mrs. Cenname noted that E.R.'s clothes were not in compliance with the school's dress code.  Parents allege that E.R.'s embarrassment at being singled out also amounts to discrimination.  (Parents' Mem. 43.)

C.  Procedural History

Parents filed a due process complaint with the Pennsylvania Department of Education on December 4, 2008, alleging that Ridley had violated the IDEA and Section 504 of the Rehabilitation Act.  Parents asserted that Ridley had failed to timely identify E.R. as a child with a disability, failed to develop an appropriate IEP, and subjected her to discrimination by failing to comply with her § 504 health plan.  The district filed its answer on December 19, 2008.

Administrative hearings were held on January 29, 2009, February 10, 2009 and March 10, 2009, and the Hearing Officer's "Decision - Due Process Hearing" Report  was issued on April 21, 2009.  In summary, the Hearing Officer found that (1) Ridley did not commit any violations in E.R.'s kindergarten year; (2) Ridley violated the IDEA, as well as § 504 in E.R.'s first grade year; and (3) the IEP proposed for E.R.'s second grade year was inadequate, thereby violating the IDEA.[5]

Ridley filed a petition for review in the Pennsylvania Commonwealth Court, and the matter was subsequently removed to the Eastern District of Pennsylvania.  E.R.'s Parents treated the petition as a complaint and filed an answer and counterclaims, adding E.R.'s first grade teacher,

_____

[5] Amendments made to Pennsylvania state law, which took effect July 1, 2008, changed the appellate process by "eliminating the Appeals Panel . . . and allowing appeals straight from the Due Process hearing to this court."  Breanne C. v. Southern York County School Dist, 2010 WL 3191851 (M.D.Pa., Aug. 11, 2010); see 22 Pa.Code 14.162(o).  All Due Process hearing requests made on or after June 15, 2008 are subject to the new appellate process.  Id. (citing Doc. 5-5, PA Dept. of Education, Office of Dispute Resolution announcement.)  In the matter before us, Parents filed their Due Process complaint on December 4, 2008.

Janet Cenname, as a third party defendant. On July 7, 2009, Parents filed a complaint essentially identical to their answer and counterclaims in this Court against Ridley and Cenname (09-3041), which was voluntarily dismissed on October 9, 2009. (Doc. no. 16.) After a Rule 16 conference, Ridley filed a motion for judgment on the administrative record, and Parents filed an answer and counter-motion for judgment on the administrative record.

D. The Hearing Officer's Conclusions

Regarding E.R.'s kindergarten year, the Hearing Officer found that Ridley did not violate the IDEA. The Officer noted that Ridley:

- Provided extra academic support for E.R. by placing her in the extended day kindergarten;

- Conducted extensive testing in the Fall of E.R.'s kindergarten year, which reflected cognitive ability and achievement levels in the average range; and

- Acquiesced to additional testing requested by Parents.

Specifically, the Officer concluded that the "evaluation produced by Ridley was substantively appropriate" and that Parents' allegation that Ridley violated the IDEA by not finding E.R. eligible for special services "lacks any basis in the testimony or documents." (H.O. Rpt. p. 14 (citing 34 C.F.R. § 300, 304(c)(6)).)

However, the Hearing Officer found that Parents had proven that Ridley improperly denied E.R. a free and appropriate education (FAPE) from the beginning of first grade to the time an evaluation was completed and the IEP team determined that E.R. was eligible for special education services in February 2008. Primarily, the Officer focused upon Mrs. Cenname's alleged failure to promptly recognize that E.R. was not progressing and was a student in need of special education, and Mrs. Cenname's alleged rejection of Parents' request for a meeting in September of that year (2007). (H.O. Rpt. p. 15.) No mention was made by the Hearing Officer of the Chester County Intermediate

9

Unit's conclusion approximately a year prior, that E.R. did not qualify as a child with special needs. Nor did the Hearing Officer discuss the results of the comprehensive evaluation and re-evaluation conducted by Ridley in April of 2007, just seven months prior to the commencement of E.R.'s first grade year, which also found that E.R. did not qualify for special instruction.

The Hearing Officer also agreed with Parents that the IEP developed between March 18, 2008 and June 9, 2008 was inadequate and therefore denied E.R. FAPE in that it "lacked appropriate design instruction in the form of a research based peer reviewed reading program." This finding was set out by the Hearing Officer in one conclusory paragraph, with little analysis as to how these conclusions were reached. The Officer further noted that because training on Project Read would not be completed until after the start of the 2008-2009 school year (second grade), the District did not have FAPE "on the table" at the beginning of the school year in violation of the IDEA. (H.O. Rpt. pp. 16-18.)

Finally, the Hearing Officer concluded that Ridley had discriminated against E.R. in violation of § 504. (29 U.S.C. § 701, § 794). The basis for this finding was primarily Mrs. Cenname's "passive aggressive behavior in having to change the way she planned to conduct several classroom projects." (H.O. Rpt. p. 19.)

The Hearing Officer awarded Parents compensatory education, based on the school's failure to provide FAPE for 2007-2008 under both the IDEA and § 504 of the Rehabilitation Act in the amount of two hours for each school day, for a total of 360 hours. The Officer also awarded Parents reimbursement of tuition at the Benchmark School for the 2008-2009 school year, and reimbursement for transportation to and from Benchmark. (H.O. Rpt. pp. 18-20.)

II.     **STANDARD OF REVIEW**

"Judicial review in IDEA cases differs substantively from judicial review in other agency

actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." Neena S. v. Sch. Dist. of Philadelphia, 2008 WL 5273546, at * 5 (E.D.Pa. Dec. 19, 2008) (quoting Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 757 (3d Cir. 1995)). In IDEA cases, district courts are required to give "due weight" to the factual findings of the Hearing Officer's decision. Id. The Court of Appeals has defined "due weight" as "modified de novo review." Id. (citing S.H. v. State-Operated Sch. Dist., 336 F.3d 260, 270 (3d Cir. 2003)). Under this standard, "a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings." Id. (quoting Knable v. Bexley City Sch. Dist., 238 F.3d 755, 764 (6th Cir. 2001)). Factual findings made by the Hearing Officer are to be considered prima facie correct. If a reviewing court fails to adhere to those findings, it is obliged to explain why. Id. (quoting M.M. v. Sch. Dist. of Greenville County, 303 F.3d 523, 530-31 (4th Cir. 2002) (citations omitted)). However, the district court is not to substitute its own notions of educational policy for those of local school authorities. Id. The court "must accept the state agency's credibility determinations unless the nontestimonial, extrinsic evidence in the record would justify a contrary conclusion." Id. (citing L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 389 n. 4 (3d Cir.2006)).

The district court is not bound by the Hearing Officer's conclusions of law and the application of legal standards at the administrative hearing are subject to de novo review. In re Educational Assignment of Joseph R., 318 Fed.Appx. 113, 118 (3d Cir. 2009).

At the administrative and district court levels, the burden of proof lies with the party challenging the IEP. Schaffer v. Weast, 546 U.S. 49, 62 (2005); Allyson v. Montgomery County Intermediate Unit, 2010 WL1255925 (E.D.Pa. 2010). Consequently, because Parents challenged the IEP, they bear the burden before this Court.

III.    **APPLICABLE LAW**

The Individuals with Disabilities Education Act's (IDEA) Child Find provision requires states to ensure that "all children residing in the state who are disabled, regardless of the severity of their disability, and who are in need of special education and related services are identified, located and evaluated." 20 U.S.C. 1412 (a)(3).  The Third Circuit has interpreted this provision to mean that states must have a system in place to timely identify disabilities.  Lauren W. v. DeFaminis, 480 F.3d 259, 275 (3d Cir. 2007).  The evaluation of children who are suspected to be learning disabled must take place within a reasonable period of time after the school is on notice of behavior that is likely to reflect a disability.  Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 250 (3d Cir. 1999).

The IDEA also mandates that children with disabilities have access to "free appropriate public education" (FAPE). 20 U.S.C. § 1400(c)(3).  FAPE includes special education and related services that:

(A)    have been provided at public expense, under public supervision and direction,  and without charge;

(B)    meet the standards of the State educational agency;

(C)    include an appropriate preschool, elementary school, or secondary school education in the State involved; and

(D)    are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).

A state must provide an individualized education program (IEP) under 20 U.S.C. § 1414(d) that is "'reasonably calculated' to enable the child to receive 'meaningful education benefits' in light of the student's 'intellectual potential.'" Shore Regional High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004) (quoting Polk v. Cent. Susquehanna Interm. Unit 16, 853 F.2d 171, 181 (3d

Cir. 1988)).[6]

To provide FAPE, the IEP "must be sufficient to confer some educational benefit upon the handicapped child." L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 390 (3d Cir. 2006). The state's obligation is not unlimited, however, nor is it required "to maximize the potential of handicapped children or provide optional level of services." T.R. v. Kingwood Twp. Bd. of Educ., 205 F.3d 572, 577 (3d Cir. 2000) (internal quotations omitted). The IDEA represents only a "basic floor of opportunity." Carlisle Area Sch. v. Scott P., 62 F.3d 520, 534 (3d Cir. 1995).

In order to obtain tuition reimbursement, the plaintiffs must show: 1) that the school district failed to offer FAPE; 2) that the school which the parents chose is an appropriate placement; and 3) that the equities weigh in favor of reimbursement. Florence Cty. Sch. Dist. v. Carter, 510 U.S. 7, 12-16, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993). Thus, if the school district offers FAPE via an appropriate IEP, reimbursement is not appropriate.

---

[6] 20 U.S.C.A. § 1414(d) requires that the IEP include: (I) a statement of the child's present levels of academic achievement and functional performance; (II) a statement of measurable annual goals, including academic and functional goals; (III) a description of how the child's progress toward meeting the annual goals described in subclause (II) will be measured and when periodic reports on the progress the child is making toward meeting the annual goals (such as through the use of quarterly or other periodic reports, concurrent with the issuance of report cards) will be provided; (IV) a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child; (V) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the activities . . .; (VI)(aa) a statement of any individual appropriate accommodations that are necessary to measure the academic achievement and functional performance of the child on State and districtwide assessments consistent with section 1412(a)(16)(A) of this title; and (bb) if the IEP Team determines that the child shall take an alternate assessment on a particular State or districtwide assessment of student achievement, a statement of why-- (AA) the child cannot participate in the regular assessment; and (BB) the particular alternate assessment selected is appropriate for the child; and (VII) the projected date for the beginning of the services and modifications described in subclause (IV), and the anticipated frequency, location, and duration of those services and modifications.

## IV.   ANALYSIS

There is no dispute that Ridley provided significant educational services to E.R.  The issue in this case is whether the services were offered in a timely fashion and whether they complied with the statutory requirements of the IDEA.   In resolving this question, I am mindful that the Supreme Court has held that:

> By passing the Act, Congress sought primarily to make public education available to handicapped children.  But in seeking to provide such access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful.  Indeed, Congress expressly "recognize[d] that in many instances the process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome." S.Rep., at 11, U.S. Code Cong. & Admin. News 1975, p. 1435.  Thus, the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.

Hendrick Hudson Dist. Bd. of Educ. v. Rowley, 458 U.S. 176, 192 (1982).[7]

A.  E.R.'s Kindergarten Year

The Hearing Officer concluded that Ridley did not deny E.R. FAPE in kindergarten.  The Officer noted that Ridley evaluated E.R. following a parent teacher conference in November 2007, and again upon her Parents request in February 2008.  The Hearing Officer agreed with Ridley's determination that E.R. was performing within the average range, was "not exceptional" and that E.R. was not deprived of FAPE.  The Officer stressed that Ridley had undertaken "extensive testing," including additional tests requested by Parents.  (H.O. Rpt.13-14.)

Parents disagree with these findings.  Despite the fact that E.R.'s kindergarten evaluation included a "slew" of testing requested by Parents, they categorize Ridley's evaluation process as

---

[7] Rowley involved the Education for All Handicapped Children Act, which was the predecessor to the IDEA.   Pardini v. Allegheny Intermediate Unit, 420 F.3d 181, 185 n. 8 (3d Cir. 2005).

"incomplete, inadequate and the conclusions unsupported by the testing and E.R.'s performance." (Parents' Mem. 48.) Parents also readily criticize E.R.'s kindergarten teacher, an educator with twenty-three years experience, who testified that based upon continuing test results, E.R. was ready for first grade and that she had a "very successful" kindergarten year. (N.T. 364-367.) Parents also question the judgment of the school psychologist with twelve years experience, who concluded that at that time E.R. did not have a learning disability and that her cognitive ability and achievement levels were average for her grade and age level. (N.T. 402-406; H.O. Rpt. 13-14.)[8]

While Parents cite to a variety of evidence that does in fact establish that E.R. had her struggles in kindergarten (Parents' Mem. 49-51), her cognitive functioning and academic skills were well within average ranges,[9] and her classroom assessments indicated steady progress. Indeed, Parents acknowledged that E.R.'s kindergarten skill summary indicated "dramatic improvement" during the second half of the school year. (N.T. 75-76.) Moreover, as noted previously, testing, selected by Parents and undertaken by the Chester County Intermediate Unit just prior to her kindergarten year, also concluded that E.R. did not qualify as a student with special needs.

Given all of these factors, I agree with the Hearing Officer that for E.R.'s kindergarten year Ridley did not deny her special education services. Ridley had an adequate system in place for monitoring and evaluating E.R., and in accordance with that system, Ridley undertook a thorough evaluation, the results of which established that she was not in need of special instruction and was therefore receiving FAPE.

---

[8] The Court notes that Parents' Counsel's characterization of these educators and E.R.'s first grade teacher (discussed infra) seemed to stray at times from acceptable advocacy to personal attacks.

[9] UPPSI-III - GIQ: 104 and PIQ: 93; WIAT-II - average skills across all academic areas; Brigance K&1 Screen - 109/113 possible. (H.O. Rpt. 23.)

B.    First Grade Year 2007-2008

Regarding the first grade year, the Hearing Officer found that Ridley denied E.R. FAPE due to its failure to timely identify E.R.'s need for special education in the beginning of first grade.  The Officer also concluded that once those special needs were identified, the IEP was deficient in that it lacked "research based, peer-reviewed" special reading instruction.  (H.O. Rpt. pp. 15-17.)  I will address each of these findings in turn.

1.    Did Ridley Fail To Identify E.R. As A Student Entitled To FAPE At The Start Of First Grade?

At the due process hearing, Parents alleged that Ridley violated the IDEA by failing to identify E.R. as a student in need of special education services at the beginning of first grade.  After finding that Ridley had acted properly in not providing FAPE for the kindergarten year, which ended in June 2007, the Hearing Officer nonetheless agreed with Parents and concluded that approximately three months later, and shortly after the summer break, Ridley had failed to timely identify E.R. as being entitled to FAPE  "in the beginning of first grade."  The Officer primarily laid blame for this failure at the feet of Mrs. Cenname, who the Officer found to be "nervous, uptight and . . . nonsensical." The Officer also seemed to place some weight on the fact that Mrs. Cenname referred to "written notes" during her testimony.  (H.O. Rpt. p. 15.)

Cognizant of the standards of review regarding credibility determinations made by the Hearing Officer, and the deferential approach I must apply in reviewing the Officer's factual findings, I nonetheless conclude that the hearing record simply does not support the conclusion that Ridley failed, within a reasonable time period, to identify E.R as a student in need of special education at the start of first grade.

Among other alleged deficiencies on Ridley's part, the Officer focused on Mrs. Cenname's alleged refusal to meet with Parents in late September after Parents became concerned with E.R.'s

16

poor test results at the beginning of the first grade year. The Officer noted that Mrs. Cenname "put off meeting with [E.R.'s] mother when asked to schedule a parent/teacher conference." (H.O. Rpt. 15.) The Officer's report cites this occurrence as a primary example of how Ridley denied E.R. FAPE during that time period. However, a careful examination of the record does not support this finding.

On this issue, E.R's mother testified that at the beginning of first grade she had written to Mrs. Cenname requesting a conference due to E.R's poor grades at the very beginning of first grade.[10] Mrs. Cenname responded, in writing, as follows:

> Dear [E.R.'s Mother],
>
> I appreciate your concern about [E.R.'s] test, but it is very early in the year. We need to give her some time. Continue to work with her at home and reinforce what we are doing in class.
>
> I will probably be out from Oct 2 - Oct. 15. If you still have concerns at that time, I will be happy to meet.

(Parents' Ex.13) (Emphasis added). Mrs. Cenname's response hardly amounts to a lack of agreement to meet, as Parents attempted to characterize it at the Administrative Hearing (N.T. 92), or that Mrs. Cenname "refused to meet" as urged by Parents Counsel. (Parents' Mem. 28.) Rather, the response reflects a clear willingness to meet with Parents, albeit a few weeks after Parents requested.

Mrs. Cenname also testified regarding this alleged "refusal to meet" issue and noted that the September test that Parents were primarily concerned about was the first math test given that school

---

[10]Parents did not produce a copy of this letter and consequently the exact date and content of this letter are unknown. ( N.T. 91.)

year.  Consistent with the note she had sent to Parents, referenced above, she testified as follows:

> Q.  What observations did you make?
>
> A.  We had our first math test probably at the end of September, beginning of October, and [E.R.] had failed that math test.  It was our very first test.  It's the first time that the children ever have a chance to be in a test taking situation. So, I wasn't overly concerned.  There were other children that also had difficulty, you know, taking a test.  So, I had spoken to [Parent] that I didn't want to get too concerned right yet about the math test . . . .
>
> Q.  Did you talk to [Parent] about [E.R.'s] academic performance?
>
> A.  The first time I remember having a conversation with [Parent] was in October. She had contacted me after the math test.
> And she was concerned about the math test and she wanted to have a conference with me.  And at that point with that first math test going home, as I explained, it was the first time in a testing situation.  I really didn't think a conference was necessary. [Parent] seemed to feel that she wanted to discuss the test with me, so I called her and we had a phone conference.  I tried to give her –
>
> Q.  When was that?
>
> A.   October the 2nd.  I tried to giver her some suggestions as to sending that number grid home, how she could work with directional words with [E.R.] on the number grid and suggested that perhaps she could also work with recognition of numbers past 20.

The testimony of Parents and Mrs. Cenname, read in conjunction with Mrs. Cenname's note, simply do not establish that Mrs. Cenname "refused" a meeting with Parents and that this refusal resulted in an unreasonable delay in FAPE for E.R.  If anything, the record reflects a willingness by Mrs. Cenname to meet shortly after Parents requested.

Rather than accept Mrs. Cenname's suggestion that E.R. be given a bit more time to acclimate to first grade,  and apparently declining Mrs. Cenname's invitation to discuss the situation, E.R.'s mother testified that she scheduled a meeting with the school principal, where she learned E.R. had been placed on a reading watch list in kindergarten.  Thereafter, through correspondence dated November 16, 2007, Parents requested a re-evaluation of E.R., which was set in motion.

The Re-evaluation Report was completed on February 26, 2008, and concluded that E.R. was in need of specially designed instruction as a child with learning disabilities. A draft IEP was then prepared with numerous recommendations for special services and accommodations. An IEP team was subsequently convened on March 28, 2008. This meeting was delayed so that Parents could assess the two programs proposed for E.R., which were located at separate schools. While the IEP was not implemented until May 9, 2008, this delay was due in large part to the fact that Ridley and Parents disagreed on what should be included. Indeed, the Hearing Officer noted, that "a large part of the delay was caused by parents on-going revisions . . ." (H.O. Rpt. 15).[11] This sequence of events simply does not establish an unreasonable delay on Ridley's part.

In further support of her finding that Ridley failed to identify E.R. in the beginning of first grade, the Hearing Officer also cites to Mrs. Cenname's statement that E.R. was making progress. The Officer found that this conclusion was incorrect in that "any progress made was inconsistent." (H.O. Rpt. p. 15.) However, the time period under scrutiny here is the first month of first grade. It is worth repeating that the Hearing Officer found that E.R. was receiving an appropriate education

---

[11] The Hearing Officer noted that Congress has stated that *de minimus* procedural violations do not constitute a deprivation of FAPE. (H.O. Rpt. 15 (citing 20 U.S.C. § 1415.)) The Officer found that while the district's procedural violation in failing to timely finalize and implement E.R.'s IEP went beyond *de minimus*, the violation was not "substantial." The Officer stressed that the primary basis for denial of FAPE was the district's failure to provide a scientifically researched, peer-reviewed reading program. (H.O. Rpt. 15-16.) Parents respond that the fact of the violation having been found, this Court can determine whether the violation was substantial. Parents allege that because the procedural violations caused a delay in implementation from March 28, 2008 until E.R.'s May 13, 2008 entry into the resource room, they "impeded the child's right to a FAPE" and "caused depravation of educational benefits." (Parents Mem. n. 32 (citing 20 U.S.C. § 1415(f)(3)(E)(ii)(I) and (III); 34 C.F.R. § 300.513(a)(2)(i) and (iii).) However, as noted above, the Officer attributed a large part of the delay to Parents "on-going revisions." Parents complaint about the absence of a peer- reviewed reading program is discussed infra.

in kindergarten. It thus, does not logically follow that Ridley knew or should have known that E.R. was not receiving an appropriate education at the beginning of first grade. The Hearing Officer's report does not explain the inherent inconsistency of agreeing with Ridley's kindergarten evaluation, which found that E.R. did not need special services, but then concluding that Ridley should have identified E.R. as qualifying for special services almost immediately when first grade commenced.

Thus, even if E.R.'s progress was "inconsistent" and Mrs. Cenname should have been more cognizant of E.R.'s struggles at the beginning of first grade, I nonetheless disagree that this mandated an immediate re-evaluation. This is because Ridley must be afforded a "reasonable time" to identify a student in need of special services. Ridgewood, 172 F.3d at 250. Compensatory education is proper from the time a school knew or should have known about the disability. M.C. v. Central Regional Sch. Dist., 81 F.3d 389. As previously noted, the school must identify a child as disabled "within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability." W.B. v. Matula, 67 F.3d 484, 501 (3d Cir. 1995). There is no bright line rule for determining what length of time is reasonable. Id.

Given the fact that E.R. had recently been evaluated and found not to need special services, the "reasonable" time period afforded to a school is especially pertinent. In such a situation, the school should be allowed a reasonable period of time after an evaluation to monitor the student, as Mrs. Cenname suggested, before again exploring whether the student is in need of further evaluation. Because the law does not require an immediate identification and evaluation, I find that the Hearing Officer made a legal and factual error in concluding that E.R. was denied FAPE and entitled to compensatory education from the beginning of first grade through the time of her re-evaluation. E.R.'s first six weeks of first grade were certainly a "reasonable time" for Ridley to review kindergarten material, and monitor E.R. before determining that she was eligible for further

evaluation.[12]

### 2. Was The Individual Education Program Implemented Inadequate For Failing To Provide A Scientifically Researched-Based Peer-Reviewed Reading Program?

I first note that Congress has instructed that school districts such as Ridley are primarily responsible for "formulating the education to be accorded a handicapped child and for choosing the educational method most suitable to the child's needs . . . ." Rowley, 458 U.S. at 207.

In February 2008, Ridley's re-evaluation found that E.R. qualified for a specially designed instruction due to learning disabilities in the areas of reading, decoding/comprehension, math computation and reasoning skills, and written language. (H.O. Rpt. ¶ 40.) Pursuant to these findings, Ridley's IEP team, headed by the school psychologist and working closely with Parents, developed an IEP for E.R. The Hearing Officer found that the IEP was inadequate, primarily because it lacked "specially designed instruction" in the form of a scientifically research-based, peer-reviewed reading program. The Officer also noted that Project Read, would not have been completed until after the start of the 2008-2009 school year, and therefore FAPE was denied for second grade. (H.O. Rpt. pp. 17-18.) These findings were reached without an explanation or analysis. I disagree with the Hearing Officer's factual and legal conclusions for the following reasons.

First, to the extent that "Project Read" was flawed because it was not based on peer-reviewed research, that alone does not render the IEP deficient. Parents urge a different conclusion and rely upon 20 U.S.C. § 1414(d)(1)(A)(i)(IV), asserting that Ridley's Special Education Teacher was "unable to identify any peer-reviewed research demonstrating the effectiveness of 'Project Read.'" (Parents' Mem. 23.) Ridley counters that Project Read "uses research-based multi-sensory reading

---

[12] It is also notable that during this time period Ridley provided extra assistance to E.R. in the way of reading and math support.

strategies." (Ridley's Mem. 16.)

20 U.S.C. § 1414 states:

The term "individualized education program" or "IEP" means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with this section and that includes –
. . .
(IV) a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child . . . .

20 U.S.C. § 1414(d)(1)(A)(i)(IV).

The United States Court of Appeals for the Third Circuit has not considered whether, based on the above language, the lack of a peer-reviewed reading program will render an IEP deficient. However, in Joshua A. v. Rocklin Unified Sch. Dist., 2008 WL 906243 (E.D.Cal. 2008), a California District Court declined to hold that § 1414(d)(1)(A)(i)(IV) requires "peer-reviewed services." Relying on Rowley, 458 U.S. at 208, the Court stressed that Congress did not require "the greatest body of research be used in order to provide FAPE." The court further stated that, "there is nothing in the Act to suggest that the failure of a public agency to provide services based on peer-reviewed research would automatically result in a denial of FAPE." Joshua, 2008 WL 906243 at *3.[13]

In Souderton Area Sch. Dist. v. J.H., 2009 WL 349733 *10 (E.D.Pa.), plaintiffs also asserted that the proposed IEP was deficient in that the proposed instructional program was not based upon "peer-reviewed" research. While the district court in Souderton did not squarely address whether § 1414(d)(1)(A)(i)(IV) mandated services that were based on peer-reviewed research, the court

---

[13] The Ninth Circuit Court of Appeals affirmed the district court finding that even though the "eclectic approach" adopted by the district was not peer-reviewed, it was based on "peer-reviewed research to the extent practicable," and therefore, it met the IDEA's substantive requirements. Joshua A. v. Rocklin Unified Sch. Dist., 319 Fed.Appx. 692 (9th Cir. 2009).

concluded that the program was sufficient to provide FAPE even though it was not "based upon peer-reviewed research" because it was identified as a "best practice."

I agree with the court in Joshua and find nothing in the language of § 1414(d)(1)(A)(i)(IV) to suggest that Ridley's failure to provide services based on "peer-reviewed research" amounts to a denial of FAPE. As the Joshua court noted, "if Congress intended to modify the Rowley standard, it would have said so." 2008 WL 906243 at *3. This conclusion seems especially sound in light of the statutory language of § 1414(d)(1)(A)(i)(IV), which states that aids and services should be based on peer-reviewed research, "to the extent practicable." This language reflects that peer-reviewed research services are in no way mandated as Parents urge.

It is also worth noting that Ridley's Director of Special Education testified that "Project Read" is a "research based" program premised upon "how children learn." E.R.'s resource room teacher, who had specific training in Project Read also testified that this program was routinely used with children with learning disabilities. (N.T. 632-633, 646.) While I have considered that Project Read was not listed on the Department of Education Clearinghouse page as having been "deemed research based," the Florida Center for Reading Research Report that the Hearing Officer relied upon states: "In conclusion, available studies of the effectiveness of Project Read are promising and the instructional strategies of Project Read are aligned with current research." (Parents' Ex. 106)

The Hearing Officer also focused on the fact that Project Read would not be available until after the start of the 2008-2009 school year. However, the Officer also noted that Ridley would be training its staff on Project Read during the summer and "the program would be up and running before the end of September 2008." (H.O. Rpt. ¶ 60.) In addressing thus short delay, Ridley's Director of Special Education testified that she "did not want to rush and do this. I wanted the teachers to be trained at a rate that I believe they would be able to implement that program." (N.T.

707.)  Given all of the other services offered to E.R., a one month delay in the implementation of Project Read is not, standing alone, sufficient to conclude the IEP for second grade was deficient.

Parents also complain that the IEP was lacking because it did not include a "multi sensory approach." (N.T. 213-214.)  However, the hearing record contains un-refuted evidence that a variety of "multi-sensory methods" were implemented for E.R. in the resource room.  These methods included use of manipulable letters, repeating reading passages, review of tape-recorded stories, use of sight cards, counting of actual coins and color coded charts.  (N.T. 617-626.)  Aimee Hodges, E.R.'s resource room teacher, was dually certified in regular and special education and had obtained her master's degree in education.  Mrs. Hodges testified that her approach to teaching E.R. was "multi-sensory," which included visual, oral and "hands on" learning.  (N.T. 610-612, 616.)

Lastly, Parents claim that E.R.'s lack of progress while in the resource room provides further support that the IEP was inappropriate.  Parents raise this issue despite the fact that the Hearing Officer concluded that E.R.'s grades in the resource room "show[ed] significant improvement." (H.O. Rpt. 56.)

Parents questioned E.R.'s progress because there was a "significant discrepancy between [E.R.'s] grades and comments from her Resource Room teacher and her first grade teachers." (H.O. Rpt. 56-57.)  Parents cite to numerous instances where E.R. was given a high grade in the resource room but when tested on the same material in the first grade classroom, did poorly. (Parents' Mem. 35-37.)

Parents' scrutiny on the alleged lack of E.R.'s progress is premature in light of the fact that she was only in the resource room for 18 days during her first grade year.  In any event, E.R.'s progress in the 18 days the IEP was implemented may not be evaluated retrospectively.  Rather, "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student,

and not at some later date. . . .  Neither the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement." Carlisle, 62 F.3d at 534 (citing Fuhrmann on Behalf of Fuhrmann v. East Hanover Bd. Of Educ., 993 F.2d 1031, 1040 (3d. Cir. 1993)).  Therefore, even if Parents are correct and the progress was merely "illusory," the lack of progress in the brief period of time services were implemented does not render the IEP deficient.

Having carefully considered all of Parents' arguments regarding alleged deficiencies in the IEP, I conclude that the IEP was statutorily compliant and that Ridley adequately provided FAPE for E.R.  The un-refuted record reflects that after numerous suggestions by Parents regarding the IEP, and several revisions which Parents approved, the IEP contained the following:

- Resource room learning support for reading, decoding and comprehension, math computation and reasoning skills, and written language disabilities;

- One hour of reading and one hour of math per day;

- The resource room reading assistance included several reading programs; with Project Read to be implemented in September of 2008;

- Ridley agreed to fund a summer extended school year program which included math tutoring three times a week; and

- A variety of teaching methods, including multi-sensory learning.  For example, E.R.'s "Suggested Specially Designed Instruction" included, but was not limited to, hearing screenings, use of multi-modal instructions, and visual tracking tools;

- E.R. was also provided a series of learning accommodations which included flexible preferential seating; quiet study/work area; breaking information into "chunks;" "listening breaks;" repeating and explaining directions and information; summarizing key points; advance notice of tests; and extended time on tests.

(H.O. Rpt. ¶ 41.)  As noted previously, E.R.'s resource room teacher had more than adequate education and professional experience.

An IEP must be "reasonably calculated to enable the child to receive educational benefits." Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982).  I recognize that the issue of whether an IEP is

appropriate is a question of fact.  <u>Carlisle Area Sch. Dist.</u>, 62 F.3d at 526.  Affording deference to the Hearing Officer's findings on the IEP, and having carefully considered all of Parents' arguments regarding the IEP's deficiencies, I conclude that Ridley did not violate the IDEA.  Moreover, the Officer's finding that the IEP was inappropriate was based on the erroneous legal conclusion that the law requires a research based program.  I therefore conclude that Ridley offered E.R. an appropriate IEP from May 2008 (first grade) and for the coming second grade year.

C.  <u>§ 504 of the Rehabilitation Act</u>

The Hearing Officer found that due to the "passive aggressive behavior" of Mrs. Cenname, E.R. was subjected to discrimination in violation of the Rehabilitation Act.  This conclusion was reached primarily relying upon Mrs. Cenname's questioning why she had to "change the way she planned to conduct several classroom projects in order to accomodat[e] E.R.'s severe allergies." (H.O.  Rpt. p. 19.)

The Rehabilitation Act, 29 U.S.C. §§ 701 <u>et seq.</u>, prohibits discrimination on the basis of disability within federally-funded programs.  This prohibition is specifically extended to public school systems through Section 504.  <u>See</u> 29 U.S.C. § 794(b)(2)(B).  This section provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a) (2002).

Under the Rehabilitation Act, an "appropriate" education is one that reasonably accommodates the needs of a handicapped child.  <u>Brendan K. v. ex rel. Lisa K. v. Easton Area Sch. Dist.</u>, 2007 WL 1160377 *13 (E.D.Pa. April 16, 2007).  While an "appropriate" education must "provide significant learning and confer meaningful benefit, . . . it need not maximize the potential

of a disabled student." Id. (citing Molly L. v. Lower Merion Sch. Dist., 194 F.Supp. 422, 430 (E.D.Pa. 2002). Therefore, while § 504 mandates that a federal funds recipient offer "reasonable" accommodations to individuals with disabilities to ensure meaningful access, it "does not mandate 'substantial' changes to its program." Id. (citing J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 70 (2d Cir. 2000)). Courts evaluating whether a school district has provided an appropriate education "should be 'mindful of the need to strike a balance between the rights of the student and his parents and the legitimate financial and administrative concerns of the School District.'" Id. (citations omitted).[14]

In the education context, § 504 claims are often brought as failure to accommodate claims, where a recipient of federal funding refuses or fails to provide reasonable accommodations to a disabled person." Taylor v. Altoona Area School District, 2010 WL 3471258 (W.D.Pa. Sept. 3, 2010) (quoting Kaitlin C. ex rel. Shannon M. v. Cheltenham Twp. School Dist., 2010 WL 786530, at *3 (March 5, 2010)). Section 504 cases are also brought based on the allegations that a service plan is inadequate. See Molly L.,194 F.Supp.2d at 430.

To prevail on a claim under Section 504 of the Rehabilitation Act, Parents must prove that: (1) E.R. is disabled as defined by the IDEA; (2) she is otherwise qualified to participate in school activities; (3) Ridley is the recipient of federal financial assistance; and (4) E.R. was excluded from

_____

[14] The substantive requirements of the Rehabilitation Act's negative prohibition and the IDEA's affirmative duty have few differences. Ridgewood, 172 F.3D at 253. The Third Circuit has "noted that the regulations implementing § 504 require school districts provide a free appropriate education to each qualified handicapped person in [its] jurisdiction." Id. There are no bright line rules to determine when a school district has provided an appropriate education as required by § 504 and when it has not." Molly L., 194 F.Supp.2d 422, 427 (E.D.Pa. 2002). "[T]he failure to provide a free appropriate public education violates [the] IDEA and therefore could violate § 504." Ridgewood, 172 F.3d at 253. However, a violation of the IDEA is not a per se violation of § 504 and the elements of a § 504 must still be proved. Andrew M. v. Del. County Office of Mental Health and Mental Retardation, 490 F.3d 337, 350 (3d Cir. 2007); Derrick F. v. Red Lion Area Sch. Dist., 2008 WL 4890178, at *12 (M.D.Pa. 2008).

participation in, denied the benefits of, or subject to discrimination at, the school.  Ridgewood, 172

F.3d at 253.  Here, the only element of the ¶ 504 analysis at issue is whether E.R. was excluded from

participation in, denied benefits of, or subject to discrimination.

Two recent district court cases illustrate the parameters of a ¶ 504 claim.  In Molly L., 194

F.Supp. at 430, plaintiffs alleged that seven accommodations made by the school district under a

§ 504 Service Plan were educationally inappropriate.  For example, one of the accommodations which

was formulated to deal with Molly's sensitivities to odors and noises dealt with lunch in the school

cafeteria.  Under the proposed § 504 Service Plan, Molly would have preferential seating to minimize

the environmental influences, the option to eat in a separate, quiet environment, and an aide in the

cafeteria.  Id. at 433.  In arguing that the accommodation was inappropriate, plaintiffs objected to

Molly eating lunch in the cafeteria.  However, they also objected to allowing Molly to leave the

cafeteria, as it would remove her "from an important social event in an elementary school."  Id.  The

court agreed with the district that plaintiffs were arguing that "an alternative to the school's cafeteria

must be created solely for Molly, and that other classmates be required to join her in this alternative

setting."  The court thus concluded that the district's proposed accommodations amounted to a

practicable compromise and that "plaintiffs' argument would require the district to exceed its legal

duty to provide an appropriate education."  Id.

In Vicky M. v. Northeastern Educational Intermediate Unit, 689 F.Supp.2d 721, 736 (M.D.Pa.

2009), plaintiffs alleged that the behavior of a teacher of children with severe behavioral problems

violated § 504.  The teacher was accused of, amongst other things, the use of bungee cords and duct

tape for restraint and discipline, and other aggressive mental and physical abuses.[15]  The court denied

the district's motion for summary judgment on the claim, finding that there were disputed questions

of fact and that "the alleged abuse would not only demonstrate that a free and appropriate education

was not being provided, but also that any effective instruction was undermined by the inappropriate

conduct."

Here, a § 504 Service Plan, providing E.R. with occupational therapy, was issued in February

of 2007. An addendum was issued on March 8, 2007 to further address E.R's food allergies and

eczema.[16]  The Service Plan provided that, due to E.R.'s severe allergies, she was "only to eat foods

provided by parents."  It further indicated that the school was to contact Parents before any activities

including shared food so that parents could provide an appropriate alternative food.  (Ridley School

District Service Agreement, Ridley's Ex. 16.)  E.R.'s teachers were made aware of her medical

conditions and the necessary accommodations.  (Ridley's Mem. 19-20.)

---

[15] Specifically, the teacher was accused of leaving students restrained in a chair and on the floor for several minutes after the students had overturned the chair; grabbing students by the ear or pinching noses causing bruising; dragging students by the hair and arms; backhanding a student causing a bloody lip; screaming into the faces of students; crushing a student's fingers; depriving a non-verbal student of a picture communication system, preventing him from being able to communicate needs such as the bathroom; forcing a student to ride home for over an hour on the bus soaked in urine; and withholding food from a student as a punishment.  Id.

[16] In it's entirety, the service agreement:  provided that E.R. would receive OT once weekly for 30 minutes direct service; provided that E.R. would receive consultative services to the home and classroom on a regular basis; cites to E.R.'s Action Plans for her food allergies and asthma; required general classroom hygiene by having all students in the classroom wash their hands before and after meals; required that E.R. wash her hands after touching PE and OT equipment; required that E.R. wear gloves (provided by Parents) when handling glue; required that E.R. use only Parent provided supplies/utensils; prohibited E.R. from ingesting or touching food containing milk, egg, or shellfish and provided that she was only to eat food provided by Parents; prohibited food containing milk, egg, or shellfish to be in, or prepared overtly in, E.R.'s presence; and, required the school contact Parents before activities including shared foods (i.e. classroom parties) so that Parents could provide appropriate alternative foods.  (Ridley's Ex. 16.)

Parents assert that E.R. was "consistently singled out, isolated and denied full participation." As a primary example of E.R.'s "isolation," Parents note that during a learning activity Mrs. Cenname planned to give E.R. "one of her cupcakes out of the nurse's freezer" while her classmates were given different snacks with red icing. On another occasion, Parents complain that during a nutritional presentation, E.R. was given a "snack from home, while the other children had the integrated nutrition snack." (Parents' Mem. 41.)

While each of these examples may illustrate how E.R.'s daily school routine necessarily had to be different than her classmates, they in no way establish that she was separated or isolated from her classmates. Indeed, the record is devoid of any instance where any type of "isolation" occurred.

Moreover, the record in no way reflects that E.R. was deprived of a learning opportunity due to her disability. Parents have not established that E.R. was prevented from meaningful participation in these activities, only that her diet was different than her classmates. While I greatly sympathize that these situations may have created some discomfort for E.R., I am not prepared to conclude they amounted to "discrimination." Section 504 requires "reasonable" accommodation, not the exact accommodation that Parents request. Referring to Mrs. Cenname's conduct as "ignorant," as Parents' Counsel has done, does not change this conclusion, nor does the fact that on a few occasions Mrs. Cenname "pointed at E.R.'s non-compliance" with the Ridley dress code.[17] An alleged lack of tact does not amount to discrimination.

Apparently, Parents and E.R.'s first grade teacher agreed that Parents would be notified when

---

[17] The district argues that the school implemented a universal uniform policy, it was enforced against all children and that Ms. Cenname's "gentle reminders to conform with a generally-applicable uniform policy" did not exclude E.R. or deny her the benefit of an education. (Ridley's Mem. 22.)

a class activity may include a food that E.R. could not eat.[18]  As in <u>Molly L.</u>, this appears to be a "practicable compromise" to accommodate E.R.  Parents have pointed to instances where this agreement was not followed (Parents' Mem. 40-42), while Ridley has pointed to numerous examples where it was followed.  (Ridley's Mem. 20-22.)  In any event, even if Mrs. Cenname knowingly disregarded this plan on a few occasions, the fact remains that there is no evidence that E.R. was ever separated or isolated from her classmates in any way, or denied meaningful participation in learning activities.  Nor is there any evidence, as was the case in <u>Vicky M.</u>, that E.R.'s education was undermined.  Therefore, I find that even accepting all of the Hearing Officer's factual findings as correct, the evidence does not rise to the level of discrimination under § 504.

## V.      <u>CONCLUSION</u>

For the reasons stated above, I agree only with the Hearing Officer that E.R. was not denied FAPE during her kindergarten year.  The remaining findings of the Officer are not supported by the record and I reject her conclusion that Ridley violated both the IDEA and § 504 of the Rehabilitation Act.  An appropriate Order follows.

---

[18] The February 9, 2007 Service Agreement, (Ridley Ex. 14) states "Contact Parents before any activities including shared foods (i.e., classroom parties) so that parent may provide appropriate alternative foods."